People of Porto Rico, Plaintiff and Appellee, *v.* Rosario Santos, José Natalí and Bernardo Oliver, Defendants and Appellants.

No. 3029. Argued February 16, 1927.—Decided March 10, 1927.

*E. Ramos Antonini, Edelmiro Huertas* and *Cipriano Olivieri* for the appellants. *José E. Figueras* for the appellee.

Mr. Justice Hutchison delivered the opinion of the court.

Rosario Santos, José Natalí and Bernardo Oliver were convicted of murder in the second degree and were sentenced,

the first mentioned to 30, the second to 20 and the third to 10 years of imprisonment.

No brief has been filed for either Santos or Natalí and a careful examination of the record discloses no sufficient ground for reversal although the proof implicating Natali and Oliver is not so clear and convincing as could be desired.

The information charges that Natalí and Oliver aided Santos in the commission of the crime imputed to him. The different degrees of responsibility not only as between Santos and the other defendants but also as between Natalí and Oliver, and as measured by the trial judge in accordance with the impression made upon him by the testimony as a whole and without the aid of any suggestion or recommendation by the jury, is plainly indicated by the various terms and specially by the rather striking contrast between the period of ten years specified in the case of Oliver and that of twenty years in the case of Natalí.

Appellant Oliver insists that the court erred in cross-examining him in a manner tending to create prejudice in the minds of the jury.

The cross-examination of this defendant by the *fiscal* and by the trial judge was as follows:

"CROSS-EXAMINATION BY THE DISTRICT ATTORNEY.

"Q. While you were near the corpse of the little girl, did you ask what was going on there, what that meeting was about?

"A. No, sir.

"Q. Why did you ask that?

"A. I was sitting next to the corpse with an arm on the cot, talking with a lady who was near me.

"Q. Is that the lady who testified here this afternoon?

"A. No, sir.

"Q. One dressed in blue?

"A. No, sir; there were many others there.

"Q. Did you not inquire near the corpse what was going on there, what that meeting was about?

"A. No, sir.

"Q. And the lady answered: 'Man, don't you see that we have here the corpse of a little girl, that this is a wake?'

"A. No, sir, I did not do that.

"Q. Didn't you take Gutiérrez—you and Natalí—after Natalí had stabbed him several times, and throw him out?

"A. Never.

"Q. Did you not say, after Gutiérrez was out, 'Not there, let's take him to the plain, to the plain?'

"A. No, sir.

"Q. Why did you tell the policeman that you knew nothing about the knife when he arrived?

"A. No, sir; when the policeman arrived and asked me for the knife—Rosario Santos had told him that I had it—at once I asked José Natalí, who came with the policeman, whether I hadn't handed him the knife immediately. They were the only persons present, that is, the policeman, José Natalí, and myself. Nobody else was awake.

"Q. When the policeman asked you for the dagger, when the policeman told you that Santos had informed him that you had it, is it true or not that you replied that you did not have it?

"Mr. Ramos for the defense: We are going to object to the question because that has not been the object of direct examination, nor has any question been asked about that.

"Judge: The court overrules the objection.

"Defense: We respectfully take exception.

"Q. When the policeman came to you and told you that Santos had told him that you had the dagger with which Gutiérrez had been killed, why did you deny then that you had it?

"Defense: It has not been shown that the witness has denied anything; you have to inquire whether he denied it, in order to establish a basis for the question.

"Judge: The defense has questioned him on direct examination and he has answered as to the manner in which he delivered the knife. The question is allowed.

"Defense: We take an exception.

"A. I did not deny that I had the knife.

"Q. Did you give it up voluntarily?

"A. Voluntarily.

"Q. When the policeman came?

"A. Yes, sir.

"Q. Did you tell the policeman who had given the knife to you?

"A. Yes, sir; Rosario Santos had told me that that was the knife with which he had been wounded and with which Floro Gutiérrez had been killed, and Rosario Santos told the policeman that I had the knife.

"Q. Where did you find that knife?

"A. Right there in the meeting; there were many people.

"Q. From where did you take it?

"A. From there.

"Q. From where?

"A. When I took hold of Rosario Santos in order to take him out, a boy appeared with the knife; the other man was already dead.

"Q. What did the boy say?

"A. Then Rosario Santos said: 'That is the knife with which they have wounded me;' then I told the boy: 'Give me that knife;' and Rosario Santos said: 'Take that knife, keep it and give it to the policeman.'

"Q. Did you clean it?

"A. No, sir.

"Q. Did you wash it?

"A. No, sir.

"Q. Was it covered with blood?

"A. Yes, sir.

"Q. When you handed it to the police, was it covered with blood?

"A. It had dried, because I gave it to a little boy and asked him to put it away in my home, and it seems that he put it in a charcoal stove (*fogón*); you know boys keep things anywhere.

"Q. Was Gutiérrez dead when you left the place?

"A. Yes, sir, when I reached the spot he was already dead.

"Q. Then you did not see the fight?

"A. No, sir.

"Q. Where were you?

"A. I was in the room where the wake was being held.

"Q. Where the corpse of the little girl lay?

"A. Yes, sir.

"Q. And where did the fight begin?

"A. The fighting was in the parlor, but the people who were in the parlor rushed to the room and filled the doorway, and then a struggle began between José Pacheco and the men who were there, and I went to a corner, and when I went to the parlor they had fallen

down already. When I arrived at the place where they were Floro Gutiérrez was already dead.

"Q. So, you did not see the fight?

"A. No, sir.

"EXAMINATION BY THE JUDGE.

"Q. What did you do with the knife when you reached your home?

"A. I took it and put it away.

"Q. Where did you put it?

"A. I gave it to a little boy to put it away.

"Q. Then you did not keep it?

"A. Yes, in my own room.

"Q. Then you did not keep it?

"A. A little son of mine kept it.

"Q. Your son?

"A. My son.

"Q. Where was it kept?

"A. In the kitchen.

"Q. In what place in the kitchen?

"A. I can not tell you that because when I called the little boy and he got up when the policeman arrived, he told me: 'Daddy, I am going to look for the knife.' And I told him: 'Go ahead, find it.' And while I put on my shoes the boy came back with the knife.

"Q. Have you not just testified that the boy put it in the stove and that the blood had dried up when the policeman arrived?

"A. Yes, sir.

"Q. And why did you say that you did not know where he put it?

"A. He put it in the kitchen, but I don't know whether it was in the stove.

"Q. Did the knife have ashes on it?

"A. The knife had no ashes on it; that's why I say that I don't know whether it was in the stove or not.

"Q. My question is whether it had ashes on it or not.

"A. It did not, I didn't notice.

"Q. Did it have blood on it or not?

"A. When I took it in my hands it had blood on it.

"Q. When the policeman arrived, I mean?

"A. It was dry.

"Q. And it had no ashes?

"A. I did not notice that.

"Q. Then the knife was clean?

"A. I did not notice it.

"Q. You have said that the knife had no blood on it, that it had no ashes, then you must have noticed in what condition it was. Was the knife clean?

"A. It was dry, for I had the knife in my hands; the boy stood like this and I took hold of the knife and handed it to the policeman, but I did not notice what was on it.

"Q. Then it had no blood on it?

"A. When I took it the first time, it had blood on it.

"Q. When the policeman arrived?

"A. I did not notice whether it had blood on it or not.

"Q. Why did you say before that it had no blood on it?

"A. That is why I said that I did not notice whether it had blood on it or not, because the boy was the one who put the knife away.

"Q. At what time did you reach your home?

"A. I arrived about eleven o'clock.

"Q. About eleven o'clock in the morning, or at night?

"A. At night.

"Q. With whom did you come?

"A. I was alone when I got home.

"Q. With whom do you live?

"A. I live in town.

"Q. Had they gone to bed when you arrived?

"A. Yes, they had gone to bed.

"Q. Did you go to bed when you got home?

"A. Yes, sir.

"Q. About how long afterwards did the policeman arrive?

"A. About an hour later; the policeman arrived about twelve o'clock.

"Q. And when the policeman arrived, did he wake you up? Did he call you?

"A. Yes, sir, he called me.

"Q. If everyone was asleep when you got home and went to bed, did you wake up the little boy and give him the knife?

"A. The boy came with me from the movies, he went with me from the movies; he was in a café next door.

"Q. Was he waiting for you at a café?

"A. In front.

"Q. And you handed the knife to the boy?

"A.   When I got home I took it and he put it away.

"Q.   You gave it to the boy to put away?

"A.   Yes, sir.

"Q.   Did you not put it away?

"A.   No, sir; he did.

"Q.   A knife with which blood had been drawn you gave to a boy to put away?

"A.   To a little boy, my son.

"Mr. Olivieri for the defense: We wish to take exception to all the questions asked by the court, because rather than questions of a judge they seem to be questions of a district attorney.

"Judge: The court is entitled to ask questions to clear up a matter, the same as the attorneys for the defense, the district attorney and the gentlemen of the jury.

"Mr. Huertas for the defense: We expressly want to further argue the exception: The judge is authorized according to law to make clear any point which is obscure, for his charge to the jury or for the knowledge of the latter, but he has no authority to confuse a witness in a certain manner and to contradict him.

"Judge: The only thing that the court has done has been precisely to make clear an obscure point with regard to the knife, as to who had put it away and the manner in which it was found an hour or one hour and a half later when the police arrived."

The *fiscal*, in answer to the contention of appellants as to the impropriety of such cross-examination on the part of the trial judge, quotes from *People* v. *Morales, alias Yare Yare*, 14 P.R.R. 227 as follows:

"Although the examination of witnesses should generally be left to counsel, nevertheless the court may interrogate them for the purpose of clearing up fundamental points, and to aid him in preparing his instructions."

In *People* v. *Acevedo*, 35 P.R.R. 886, an opinion filed by the writer in which Mr. Justice Wolf concurred contained the following caution as to the better practice in the absence of circumstances justifying a departure from the general rule:

"The right of a district judge to participate in the examination of witnesses, so long as the exercise thereof is kept within reasonable

limits of a sound judicial discretion, can not be denied and has been uniformly sustained by this court. In the absence of objection or exception a slight over-indulgence in this regard would not warrant a reversal.

"The conduct of the case for the government, however, especially in jury trials, should be left to the district attorney. Otherwise excessive interference by the court, if the general trend of the questions propounded and comments made is favorable to the prosecution, is calculated to prejudice the minds of the jury against the defendant and when considered in connection with other circumstances in the case may lead to the inevitable conclusion on appeal that the accused has not had a fair and impartial trial."

In the case at bar the objection interposed by counsel was timely and proper, but the trial judge promptly desisted, and in effect disclaimed any intention of assisting the prosecution. While the question put by the court discloses a tendency to become somewhat argumentative and agressive, yet, up to the time objection was made we find no such abuse of discretion as would warrant a reversal.

In the cross-examination of witnesses for the defense in a criminal case, and especially when dealing with the defendant himself, it is well to remember that although a defendant who takes the stand lays himself open to cross-examination as in the case of any other witness, nevertheless a question which would be perfectly proper when coming from a district attorney may prejudice the defendant in the minds of the jury when emanating from the bench. A somewhat greater degree of carelessness in this regard than is indicated by the extract from the stenographic record, *supra,* if objected to as in the instant case, or if coupled with other circumstances, may leave this court no alternative but to reverse in cases wherein the government otherwise might be saved the expense and contingencies of a second trial.

In the case at bar however all things considered we can not conclude that defendant was prejudiced in any substantial right. The instructions were full and complete as well as fair and impartial.

The testimony of two witnesses if accepted as true, as it was accepted by the jury, suffices to sustain the verdict. The judgment appealed from must be affirmed.